UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

R.J. OSTERHOUDT,

                        Plaintiff,

        -v-

THE CITY OF NEW YORK; New York City Police
Department Officer ("P.O.") HENRY YANEZ (Shield
No. 17147); Former SERGEANT (" SGT.") STEVEN
MARINO (Shield No. 1897); P.O. MICHAEL
BLACK (Shield No. 9664); P.O. LUIS JAIME (Shield
No. 16888); P.O. RALPH GONZALEZ (Shield No.
9024); in their individual and official capacities,

                        Defendants.

------------------------------------------------------------------------x

**FIRST AMENDED COMPLAINT
AND DEMAND FOR JURY
TRIAL**

**<u>10-CV-3173 (RJD) (RML)</u>**

      Plaintiff R.J. OSTERHOUDT, by his attorney, DAVID B. RANKIN of the Law Office of

Rankin and Taylor, as and for his first amended complaint, does hereby state and allege:

<u>**PRELIMINARY STATEMENT**</u>

1.  This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, and

    Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

    Act of 1871, <u>as amended</u>, codified as 42 U.S.C. § 1983.

2.  Plaintiff R.J. OSTERHOUDT's rights were violated when officers of the NEW YORK CITY

    POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis seized,

    detained, arrested and used gratuitous, unlawful force against the plaintiff.  By reason of

    defendants' actions, including their unreasonable and unlawful conduct, unreasonable search,

    protracted seizure, and malicious prosecution, plaintiff was deprived of his constitutional

    rights.

1

3. Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

5. Venue is proper pursuant to 28 U.S.C. § 1391 in that plaintiff's claim arose in the Eastern District of New York.

6. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

7. Plaintiff R.J. OSTERHOUDT was at all times relevant to this action, a resident of the County of Kings in the State of New York.  He is currently a resident of the County of Queens in the State of New York.

8. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by NYPD.

9. Defendants New York City Police Department Officer ("P.O.") New York City Police Department Officer ("P.O.") HENRY YANEZ (Shield No. 17147), P.O. MICHAEL BLACK (Shield No. 9664), P.O. LUIS JAIME (Shield No. 16888), and P.O. RALPH GONZALEZ (Shield No. 9024) (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

2

10. Defendant SERGEANT ("SGT.") STEVEN MARINO (Shield No. 1897) was, at all times relevant, an officer, employee and agent of the NYPD.  Upon information and belief, defendant SGT. MARINO is retired and no longer an active member of the police force.

11. The individual defendants are being sued herein in their individual and official capacities.

12. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

13. Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for plaintiff's rights.

14. At all relevant times, the defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

15. The events described herein occurred principally in the Williamsburg neighborhood in the County of Kings in the early morning hours of November 5, 2008, immediately following the historic election of Barack Obama as President of the United States.

16. Upon information and belief, on November 4, 2008, officers at the NYPD's 90th and 94th Precincts, including the individual defendants, received briefings concerning policing practices to be used in the event of street gatherings related to the election that night.  Upon

3

information and belief, this tactical plan instructed officers about the methods to be used in crowd-control and about the expectation for officers to make arrests and issue summonses on that night.

17. At some point after Senator John McCain's concession speech, plaintiff R.J. OSTERHOUDT arrived in the vicinity of Bedford Avenue and North 7th Street, the site of a spontaneous street celebration related to the election results.

18. Upon arrival, plaintiff immediately noticed, inter alia, the police presence in the area, mostly uniformed officers on patrol.

19. After some time, dozens of police in so-called riot gear, including some of the individual defendants, arrived in the area. These officers began instigating baseless confrontations with bystanders, escalating the previously peaceful celebration in and around the street.

20. Around 1:00 A.M., the police in riot gear arranged themselves in formations such that they lined either side of Bedford Avenue on both sides of that street.

21. While the police got into position, the plaintiff stood nearby on the sidewalk, which had become crowded due to the riot police moving bystanders out of their way.

22. At least one (1) NYPD officer or officers told plaintiff to move onto the sidewalk which was on the opposite side of Bedford Avenue from his apartment.

23. Plaintiff, while attempting to comply with the order, was forcefully and repeatedly shoved by police officers towards the already-crowded sidewalk.

24. While on the sidewalk, plaintiff observed a woman riding a bicycle get thrown to the ground by police officers and subsequently arrested.

25. Once on the sidewalk, the plaintiff and his roommate, one Matthew Carroll, were instructed by two (2) police officers in riot gear to stay on the sidewalk until instructed by the officers

4

to leave.  During this time, plaintiff observed several officers beating up civilians without cause.

26. While observing this police conduct, an NYPD Community Affairs officer told plaintiff to "go the fuck home."

27. Plaintiff sought to comply with the order by leaving the area, but he was stopped by an NYPD Community Affairs officer who told plaintiff to stay where he was.

28. While plaintiff was being issued contradictory orders by the police, plaintiff noticed NYPD supervisory officials directing the arrests of several bystanders.

29. Then, the crush of the crowd behind and around plaintiff caused plaintiff to stumble forward. Defendant SGT. MARINO and/or defendant P.O. YANEZ then hit plaintiff's right forearm with his baton, causing plaintiff to drop his cell phone which he had been carrying in his right hand.

30. The phone bounced into the line of officers in riot gear, causing the phone to be out of sight and out of reach of the plaintiff.

31. Plaintiff then asked defendant SGT. MARINO if he could retrieve his phone.

32. In response, defendant SGT. MARINO yelled at plaintiff, in sum and substance, "MOVE! GET OUT OF HERE!"

33. However, because of the crowd all around him, there was no direction in which plaintiff could move.

    a.  For instance, plaintiff was pinned against a rail to a wheelchair ramp to his left with a line of officers in riot gear in front of him, including but not limited to defendants SGT. MARINO and P.O. YANEZ, as well as P.O. Candido Salgado (Shield No.

26462), P.O. Anthony Colaianni (Shield No. 23973), and P.O. Ramses Cruz (Shield No. 6083).

b.   Simultaneously, there were other officers to plaintiff's immediate right and rear, including but not limited to defendants P.O. GONZALEZ, P.O. BLACK, and P.O. JAIME, as well as P.O. William Chien (Shield No. 17147).

c.   Defendant P.O. BLACK had his hand or arm on plaintiff's back, forcing him into the front line of officers in riot gear.  Thus, the police officers' conduct made it factually impossible for plaintiff to comply with defendant SGT. MARINO's order.

34. Plaintiff crouched down to reach for his phone on the ground.

35. While plaintiff was crouching down, defendant P.O. GONZALEZ grabbed plaintiff from behind by the yoke of his shirt and handcuffed him on the street.

36. Shortly thereafter, defendant SGT. MARINO told plaintiff, in sum and substance, "HERE'S YOUR PHONE, ASSHOLE" and slipped the phone into plaintiff's front right pocket.

37. Defendant P.O. GONZALEZ handcuffed plaintiff in an unnecessarily tight manner, causing plaintiff substantial pain and discomfort.

38. Plaintiff was transported to the 94th Precinct.  While in transport, one of the officers in the police cruiser told plaintiff he was being given a ticket and would be home in a half-hour.

39. Plaintiff was then transported to Central Booking around 2:30 P.M.  Around this time, an officer told plaintiff he did not see plaintiff commit any illegal act and that the charges would be dropped at arraignment.

40. Soon thereafter at Central Booking, however, several officers repeatedly harassed and taunted plaintiff, telling him that he was in big trouble because the officers were under the belief that plaintiff injured several officers on the street.

6

41. Plaintiff was charged on docket number 2008KN082708 on charges of obstruction of governmental administration in the second degree, P.L. § 195.05; resisting arrest, P.L. § 205.30; and disorderly conduct, P.L. § 240.20(6).

42. The accusatory instrument was sworn to by P.O. Kevin Mahones (Shield No. 6068), and the factual portion of said accusatory instrument read as follows:

> [P.O. Mahones] is informed by [P.O. Steven M. Pedullo (Shield No. 12511)], of 94 Command that… [P.O. Pedullo] observed [plaintiff] engage in fighting, tumultuous and threatening behavior on a public sidewalk.
>
> [P.O. Mahones] is informed by [P.O. Pedullo] that [plaintiff] refused an order to disperse when asked to do so by [P.O. Pedullo].
>
> [P.O. Mahones] is further informed by [P.O. Pedullo] that pursuant to a lawful arrest, defendant struggled and refused to be handcuffed.

43. Plaintiff was arraigned and released from custody at approximately 8:30 P.M.

44. Thus, plaintiff spent approximately seventeen (17) hours in defendants' custody.

45. In early March of 2009, the Kings County District Attorney's office filed a superseding information, again sworn to by P.O. Mahones, stating:

> [P.O. Mahones] is informed by [P.O. Pedullo] that, at the above time and place, a public sidewalk, informant was dispatched for crowd control dressed in riot (*sic*) gear when informant observed many New York City Police Officers trying to disperse a crowd of individuals, who were shouting loudly and pushing other police officers and informant observed another New York City Police Officer making a lawful arrest of another individual when the [plaintiff] did grab the that (*sic*) Police Officer on the shoulder and arm and did pull and push that officer's arm and shoulder and [plaintiff] did say in sum and substance, GET OFF MY FRIEND.
>
> [P.O. Mahones] is informed by [P.O. Pedullo] that the [plaintiff] repeatedly refused an order to disperse when asked to so do by informant.

7

> [P.O. Mahones] is further informed by [P.O. Pedullo] that [plaintiff] flailed [his] arms preventing [P.O. Pedullo] from hand cuffing [the plaintiff], pursuant to a lawful request.

46. The Kings County District Attorney aggressively prosecuted these charges, offering the plaintiff only a plea to the charges and a 15-day jail sentence, despite the fact that plaintiff had never before been arrested.

47. Plaintiff's arrest was captured on videotape.

48. When a new prosecutor was assigned to the case and after plaintiff's counsel sent the new prosecutor the video of plaintiff's arrest, the prosecutor offered plaintiff an adjournment in contemplation of dismissal ("ACD").

49. At his eleventh court appearance on docket number 2008KN082708, plaintiff accepted the offer of an ACD, ultimately resulting in dismissal of the charges.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS UNDER THE**
**UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

50. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

51. Defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. § 1983, thereby depriving plaintiff of his rights, privileges and immunities secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

    a.   Freedom from arrest without probable cause;

    b.   Freedom from unreasonable seizure of his person, including the excessive use of force;

    c.   Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

    d.   Freedom from the lodging of false charges against him by police;

    e.   Freedom from retaliatory prosecution;

    f.   Freedom from abuse of process; and

    g.   Freedom from deprivation of liberty without due process of law.

52. Defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983**

53. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

54. By failing to remedy the wrongs committed by their subordinates which occurred in their presence, at their direction, and with full knowledge of their consequences to the plaintiff, and in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in the constitutional injuries described above, defendant SGT. MARINO caused damage and injury in violation of plaintiff's rights guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. § 1983.

55. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### THIRD CLAIM
### <u>FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983</u>

56. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

57. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

58. Defendants P.O. YANEZ and P.O. JAIME were present and aware of the arrest and use of obviously excessive force against plaintiff by defendants SGT. MARINO, P.O. GONZALEZ, and P.O BLACK, yet defendants P.O. YANEZ and P.O. JAIME failed to take any action or make any effort to intervene, halt or protect the plaintiff from being arrested or subjected to excessive force by defendants SGT. MARINO, P.O. GONZALEZ, and P.O BLACK.

59. Defendants P.O. YANEZ and P.O. JAIME's violations of plaintiff's constitutional rights by failing to intervene in defendants SGT. MARINO, P.O. GONZALEZ, and P.O BLACK's clearly unconstitutional use of force and plaintiff's unconstitutional arrest resulted in the injuries and damages set forth above.

### FOURTH CLAIM
### <u>*MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983</u>

60. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

61. All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY

which were in existence at the time of the conduct alleged herein and were engaged in with

the full knowledge, consent, and cooperation and under the supervisory authority of the

defendant CITY and its agency, the NYPD.

62. Defendant CITY and the NYPD, by their policy-making agents, servants and employees,

authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or

failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

63. The acts complained of were carried out by the aforementioned individual defendants in their

capacities as police officers and officials pursuant to customs, policies, usages, practices,

procedures and rules of the CITY and the NYPD, all under the supervision of ranking

officers of the NYPD.

64. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD

include, but are not limited to, the following unconstitutional practices:

    a.  Arresting persons known to be innocent in order to meet "productivity goals" (*i.e.*, arrest quotas), particularly where such persons are engaged in activity protected by the First Amendment or the consent decree Black v. Codd;

    b.  Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i.  in order to protect other officers; and

        ii.  in order to meet said productivity goals; and/or

        iii.  in order to chill or obstruct persons from lawfully observing arrests of persons in public;

    c.  Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

    d.  Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

    e.  Retaliating against officers who report police misconduct; and

    f.  Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

65. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

a. Long v. City of New York, 09 Civ. 9216 (AKH) (S.D.N.Y.); *People v. Pogan*, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, *to wit*, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

b. Taylor-Mickens v. City of New York, 09 Civ. 7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

c. Lin v. City of New York, 09 Civ. 1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[1]

d. Colon v. City of New York, 09 Civ. 00008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

e. Callaghan v. City of New York, 07 Civ. 9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

---

[1] For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

f.  Dunlop v. City of New York, 06 Civ. 0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

g.  Carmody v. City of New York, 05 Civ. 8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

h.  MacNamara v. City of New York, 04 Civ. 9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

i.  McMillan v. City of New York, 04 Civ. 3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

j.  Avent v. City of New York, 04 Civ. 2451 (CBA) (CLP) (E.D.N.Y.) (same);

k.  Smith v. City of New York, 04 Civ. 1045 (RRM) (JMA) (E.D.N.Y.) (same);

l.  Powers v. City of New York, 04 Civ. 2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

m.  Allen v. City of New York, 03 Civ. 2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum; numerous police officers falsely swear that they gave orders to disperse; and, even if they had given such orders, the police provided no place of egress for the protestors to disperse);

n.  Nonnemann v. The City of New York, 02 Civ. 10131 (JSR) (AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

o.  Richardson v. City of New York, 02 Civ. 3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p.  Barry v. New York City Police Department, 01 Civ. 10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive

13

custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q. <u>Taylor v. City of New York</u>, 01 Civ. 5750 (ILG) (MDG) (E.D.N.Y.) (same as *Richardson*, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

r. <u>Walton v. Safir</u>, 99 Civ. 4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

s. <u>White-Ruiz v. City of New York</u>, 93 Civ. 7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

t. <u>Ariza v. City of New York</u>, 93 Civ. 5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department); and

u. *<u>Sorlucco v. New York City Police Department</u>*, 89 Civ. 7225 (CCH), 88 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her).

66. Furthermore, the existence of the aforesaid unconstitutional customs and policies,

**specifically with regard to "productivity goals,"** may be further inferred from the

following:

a. As reported by the media on January 20, 2006 and again on March 2, 2010, Deputy Commissioner Paul J. Browne admitted that commanders are permitted to set "productivity goals."[2]

b. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through

---

[2]     Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

coercion and threats of job loss, *to wit*, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing.  You're gong (sic) to be doing a lot more, a lot more than what they're saying."  The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[3]

c.   Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing."  The officer explained that they needed to meet quotas.[4]

d.   The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month.  Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations."  She ordered the city to cease and desist from the practice.[5]

e.   Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month.  According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

---

[3]      *Id.*

[4]      Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_ m7iRAd9b4E9alYPuGvy5OO.

[5]      *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[6]

67. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

    a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[7]

    b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

---

[6]    Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

[7]    Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09 Civ. 00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain.  It's more for convenience."[8]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[9]  When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s).   Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions."   Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008.  Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[10]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[11]

68. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out**

---

[8]      Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[9]      In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[10]      Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[11]      Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

**criminal complaints, or otherwise falsifying or fabricating evidence**, are further

evidenced, <u>inter alia</u>, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[12]
>
> […]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[13]

b. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[14] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

---

[12]     Mollen Commission Report, p. 36.

[13]     Mollen Commission Report, pp. 40-41.

[14]     Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

That's a significant increase over previous years, sources said.

"In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[15]

c.   In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel.  Mr. Kim was convicted of those offenses.  The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids."  The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest.  According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[16]

d.   The CITY recently settled a civil rights lawsuit wherein one Officer Sean Spencer[17] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000.   In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."  According to the attorney for

---

[15]      *Id.*

[16]      John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[17]      In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[18]

e.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports.  District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[19]

69. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

a.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

70. The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

---

[18]  *Id.*

[19]  David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

71. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned <u>de facto</u> policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, <u>inter alia</u>, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

72. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the right:

    a.   Not to be deprived of liberty without due process of law;

    b.   To be free from seizure and arrest not based upon probable cause;

    c.   Not to have excessive force imposed upon him;

    d.   To be free from unlawful search;

    e.   To be free from unwarranted and malicious criminal prosecution;

    f.   To be free from malicious abuse of process; and

g.   To receive equal protection under the law.

73. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

74. Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

75. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

76. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein.  Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable

cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights.  Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

77. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

78. The actions of the individual police defendants resulted from and were taken pursuant to the following de facto policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

79. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

## JURY DEMAND

80. Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

WHEREFORE, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.    That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.    That he be awarded punitive damages against the individual defendants; and

23

c.      That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.      For such other further and different relief as to the Court may seem just and proper.

Dated: New York, New York
       April 19, 2011

Respectfully submitted,

/s/

By:   _____
     David B. Rankin (DR 0863)
     Law Office of Rankin & Taylor
     *Attorneys for Plaintiff*
     350 Broadway, Suite 700
     New York, NY 10013
     t: 212-226-4507